1
2
3

**ALMEIDA LAW GROUP LLC**
John R. Parker, Jr. (SBN 257761)
3550 Watt Avenue, Suite 140
Sacramento, California 95821
Tel: (916) 616-2936
jrparker@almeidalawgroup.com

4  *Counsel for Plaintiff & the Proposed Classes*

5  *[Additional Counsel on Signature Page]*

6
7

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

8
9

ASHLEY DAVIS, *individually and on behalf of all others similarly situated*,

10              Plaintiff,

11      vs.

12
13
14

RAKUTEN USA, INC. and EBATES PERFORMANCE MARKETING, INC. d/b/a RAKUTEN REWARDS,

              Defendants.

Case No.: 3:25-cv-2113

**CLASS ACTION COMPLAINT**

1. VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT 18 U.S.C. §§ 2510, *ET SEQ.*

2. UNJUST ENRICHMENT

3. INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

4. CONVERSION

5. VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (UCL) CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*

6. VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT CAL. PENAL CODE § 502

7. VIOLATION OF THE CAL. INVASION OF PRIVACY ACT CAL. PENAL CODE §§ 630, *ET SEQ.*

**DEMAND FOR JURY TRIAL**

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Ashley Davis ("**Plaintiff**"), individually and on behalf of all others similarly situated, brings this class action lawsuit against Rakuten USA, Inc. and Ebates Performance Marketing, Inc. (collectively, "**Rakuten**" or "**Defendant**") and alleges, upon personal knowledge as to their own actions and their counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.  Plaintiff brings this class action lawsuit against Rakuten, for its deceptive, unfair, and unlawful practice of stealing affiliate marketing commissions from content creators by configuring its Browser Extension to remove any code associated with or otherwise identifying the content creators (who originated the transaction) and replacing that code with its own.

2.  Affiliate marketing connects digital content creators with e-commerce vendors, with the latter paying commissions only when the content creators' promotions convert individuals from consumers of the creators' content into paying customers of the vendors.

3.  Instead of paying upfront marketing costs, these performance-based sales for the vendors are driven by creators who spend years and years producing content (often with no compensation whatsoever) and acquiring loyal followers on YouTube, Instagram, TikTok, and other digital media platforms.

4.  This economic ecosystem depends on affiliate links and browser cookies. Affiliate links direct a user from a content creator's site or post to the webpage offering the vendor's product. A unique browser cookie is embedded in this link so that when a consumer clicks through and makes a purchase the affiliate link is tracked through successive browser cookies on each page. This process ensures that the creator is credited for promoting the sale by the vendor.

5.  When a consumer clicks an affiliate link and is redirected to the vendor's website, the embedded browser cookie uniquely identifies that consumer's visit as originating from the content creator's promotion.

6.  As the consumer navigates the vendor's site, this cookie remains active, logging each relevant pageview so that if the consumer makes a purchase during that session or while the cookie is valid, the sale is attributed to the content creator.

CLASS ACTION COMPLAINT

7.    The process streamlines the online customer acquisition channel by aligning the financial incentives of vendors and content creators. In contrast to traditional marketing, which requires upfront payments without guaranteed conversion, the affiliate model ensures that vendors only incur costs in relation to actual sales—an arrangement that often benefits smaller businesses seeking to minimize marketing overhead while still being able to access large and engaged (because of the content creators' work) audiences.

8.    These transactions are typically governed by affiliate program agreements that outline the commission structure, payment schedules, permissible promotional methods, and the duration of tracking cookies. The agreements provide a legal framework for both vendors and creators, defining each party's obligations, remedying potential disputes about attribution or commission calculations, and protecting against fraudulent or misleading marketing practices.

9.    Browser Extensions are software add-ons that modify users' online experiences. As is relevant here, these Browser Extensions are used in the affiliate marketing ecosystem. While many extensions serve legitimate functions such as providing discount codes or price comparisons, they can—if misused—alter affiliate tracking data. That is, by intercepting and replacing existing referral codes with their own, Browser Extensions *can* redirect commissions away from the original referring content creators thereby depriving those creators of their earned commissions.

10.    In December 2024, MegaLag, a tech-investigating YouTuber, showed that PayPal's Honey Browser Extension, marketed as an innocent coupon-finding finder, was actually perpetrating a sophisticated bait-and-switch scheme designed to deprive those content creators of their rightful commissions.

11.    When users clicked "Apply Coupon," Honey secretly erased creators' digital fingerprints and inserted its own, effectively stealing commissions that rightfully belonged to creators who had done the real work of driving sales based on, among other things, their work in building their subscriber base and promoting the product(s) in question.[1]

12.    MegaLag's exposé prompted other investigations which revealed other coupon

---

[1]    Megalag, *Exposing the Honey Influencer Scam*, December    21,    2024 https://www.youtube.com/watch?v=vc4yL3YTwWk (last visited Feb. 27, 2025).

extensions perpetrating the same or similar schemes including Rakuten's Browser Extension.

13.    Rakuten's Browser Extension (the "Browser Extension") operates in the same way. Users download and install the extension from the Rakuten website.[2] After installing and activating the extension, users will often be presented with a banner when visiting an ecommerce site. This banner will offer the user a discount or coupon on the item they are viewing. If the user clicks this graphic, the Browser Extension will erase any code affiliated with the content creator and input Rakuten's own code thereby depriving the content creator of earned commissions on a transaction that would not have occurred but for the content creator's efforts.

14.    Plaintiff, on behalf of herself and all those similarly situated asserts representative claims for violations of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* ("ECPA"), California's Unfair Competition Law, Cal. Business & Professions Code §§ 17200, *et seq.*, California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*, Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, as well as counts for conversion, unjust enrichment, and intentional interference with prospective economic advantage.

### PARTIES

15.    Plaintiff Ashley Davis is a resident of Oakland, California. She receives affiliate marketing commissions from the sale of beauty and lifestyle products that she promotes and links on her social media pages.

16.    Defendant Rakuten USA, Inc. is a Delaware corporation headquartered at 800 Concar Drive, Suite 175 in San Mateo, California, 94402. Rakuten operates various online and digital services including, but not limited to, e-commerce, cashback rewards, digital content, and financial technology solutions, and conducts significant business operations throughout the United States.

17.    Defendant Ebates is a Delaware corporation, with its principal place of business at 800 Concar Drive, Suite 175 in San Mateo, California, 94402. Ebates is a wholly owned subsidiary of Rakuten USA Inc.

### JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§

---

[2] https://www.rakuten.com/extension (last visited Feb. 27, 2025).

1331 and 1367.

19.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action lawsuit in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, the number of persons in the proposed class exceeds 100, and at least one member of the Class is a citizen of a state different from that of Defendant.

20.     This Court has personal jurisdiction over Defendant because it is headquartered in San Mateo, California and conducts significant operations in this judicial district.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2), and (b)(3).

## FACTUAL BACKGROUND

**A.    Affiliate Marketing.**

22.     Affiliate marketing is an agreement between online vendors and content creators who agree to showcase or promote certain products of the vendors.

23.     Affiliate marketing has grown into a multibillion-dollar industry in which Vendors (or "Merchants") pay affiliate marketers only upon consumers' completed purchase, lead submission, or other qualifying action.[3]

24.     Because affiliates are compensated for verified performance rather than mere clicks or impressions, this model drives an estimated sixteen percent of North American e-commerce sales and is projected to exceed ten billion dollars in U.S. spend alone by 2024.[4]

25.     Affiliate marketing relies on the trust that content creators have built with their followers which is generated and fostered over years and years of work without any guarantee of compensation. Regardless of how much time, energy, risk, effort and cost content creators put into building their brand, they are only paid when their promotions lead directly to sales.

26.     In order to determine who rightfully should receive credit for creating the content that,

---

[3] David Gasparyan, *Affiliate Marketing: Predictions and Strategies for Success*, Forbes (Sept. 20, 2023), https://www.forbes.com/sites/forbestechcouncil/2023/09/20/affiliate-marketing-predictions-and-strategies-for-success/ (last visited Feb. 8, 2025).

[4] Charlotte Muzzi, *Affiliate Marketing Statistics You Can't Ignore in 2025*, https://www.shopify.com/blog/affiliate-marketing-statistics (last visited Feb. 8, 2025).

in turn, lead to the sale, affiliate marketing depends on accurately tracking the source or origin of clicks.

27.    To this end, hyperlinks on a content creator's page carry a specific tracking code which follows consumer's clicks across webpages, called affiliate links.

28.    The affiliate links and cookies lead back to the creator who initiated the sale, ensuring proper attribution to the creator.

29.    These cookies typically last 14 to 30 days; during their lifetime, the cookies ensure that when a shopper returns to complete a purchase, the appropriate creator receives their due commission.

30.    For example, imagine a travel blogger partners with a luggage vendor through an affiliate program. The travel blogger might include a unique affiliate link to the luggage vendor's website at the end of the post. When a reader clicks on the link to the vendor's site, a browser cookie is generated that identifies the blogger as the referral source.

31.    Should the reader decide to purchase the suitcase during the resultant visit to the luggage vendor's website, or even if they come back days later provided the cookie is still active, the vendor's tracking system will attribute the sale to the blogger.

32.    As provided in the affiliate agreement, the vendor would then pay the blogger a predefined percentage of the sale price, reflecting the performance-based nature of the arrangement and ensuring direct compensation for the blogger's marketing efforts.

**B.    Rakuten's Browser Extension Scam.**

33.    In 2014, Rakuten purchased Ebates, Inc. for $1 billion.

34.    Ebates was an e-commerce company which operated a Browser Extension that offered discounts to online shoppers.

35.    In 2019, Rakuten rebranded all Ebates properties, including the Browser Extension, under the Rakuten brand name.

36.    The extension is free and available to anyone and can be downloaded for Chrome, Firefox, Edge, and Safari browsers.

37.    As of February 2025, the Browser Extension had been downloaded approximately

four million on Chrome alone.[5]

38.    Rakuten offers instant coupon testing and price comparisons across sites, incenting users to click recurring popups offering instant savings.

39.    When a user clicks one of these popups, Rakuten diverts commissions from content creators, replacing creators' tracking information with its own.

40.    At least four million unwitting subscribers have become part of this commission-diversion scheme, which operates as follows:

      a.    A user clicks a creator's affiliate link to visit a vendor's website. This plants a cookie containing the creator's unique tracking code.

---

[5]https://www.rakuten.com/extension-sem

CLASS ACTION COMPLAINT

b.  For instance: clicking an affiliate link from a creator's page redirects to the retail seller's page, in this case Walmart, with the creator's tracking code embedded in the URL.



c.  A unique tracking code (in this case, the WMLSPARTNER parameter) gets stored in the URL and the site's cookies.

d.  Users who have installed Rakuten's shopping extension will see a popup offering cash back coupons.

7



e.  Upon clicking the popup, the Browser Extension executes its switch: it injects code that replaces the creator's tracking number with Rakuten's own, as seen by the changed value of the WMLSPARTNER parameter below.

https://www.walmart.com/ip/Nintendo-Switch-OLED-Model-with-Neon-Red-Neon-Blue-Joy-Con/787152679?classType=REGULAR&athbdg=L1102&campaign_id=9383&sharedid=&clickid=2H11%3AASgNxyKTDw2yRRi70JzUkswDqSBQx0v180&irgwc=1&im_rewards=1&sourceid=imp_2H11%3AASgNxyKTDw2yRRi70JzUkswDqSBQx0v180&veh=aff&**wmlspartner=imp_10579**&affiliates_ad_id=565706

f.  This timing is calculated to exploit the industry's "last-click attribution" standard.

41.  By surreptitiously injecting itself into the affiliate marketing attribution network, Rakuten claims commissions meant for creators who did the actual work of directing consumers to

CLASS ACTION COMPLAINT

the vendor's site.

42.    The impact is direct and ongoing: creators consistently lose their earned commissions to this practice.

43.    As of February 2025, the Rakuten Browser Extension remains active on the Chrome extension store website.

**C.    Representative Plaintiff's Experiences.**

44.    Plaintiff Davis has been actively involved in affiliate marketing since at least 2023.

45.    Plaintiff promotes products and services through well-known affiliate programs, including those offered by Amazon and TikTok.

46.    Plaintiff's online promotional efforts have generated appreciable sales and driven substantial consumer traffic by embedding affiliate links (for example, Amazon URLs promoting beauty products and lifestyle projects) within her digital content.

47.    Plaintiff has spent significant time and energy building her affiliate marketing business and now relies on these affiliate marketing links for part of her personal income.

48.    While Plaintiff's social media pages received considerable high engagement on her social media pages, her affiliate marketing revenue was not commensurate with the popularity of her pages.

49.    Plaintiff found this trend to be odd. She was not aware of the Rakuten Browser Extension scam until February 2025 because the Honey scam was not revealed until December 2024 and which then spurred investigation into other similar shopping extensions.

50.    Upon information and good faith belief, Plaintiff has been damaged by Rakuten's interception and manipulation of her affiliate source information that resulted in Rakuten diverting commissions that Plaintiff rightfully earned.

### TOLLING OF STATUTE OF LIMITATIONS, CONCEALMENT, AND ESTOPPEL

51.    Each unauthorized diversion of Plaintiff's and Class Members' commissions is a separate unlawful act that triggers anew the relevant statute of limitations.

52.    Additionally, any applicable statutes of limitation have been tolled by: (i) the

fraudulent concealment doctrine based on Rakuten's knowing and active concealment of the facts alleged herein including, but not limited to, its removal of Plaintiff's and Class Members' information in cookies and replacement of that information in cookies with its own, while representing to Plaintiff and Class Members, through Defendant's advertisements, that Rakuten Shopping is just a money saving tool for consumers and (ii) the delayed discovery doctrine, as Plaintiff and Class Members did not and could not reasonably have discovered Defendant's conduct alleged herein until shortly before the filing of this Complaint.

53.    The tools embedded in the Rakuten Browser Extension that allow it to track consumers' shopping activity and manipulate affiliate source information are hidden from view. Creators have no way of knowing that the Rakuten Browser Extension manipulates their affiliate source information in cookies.

54.    Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

55.    The earliest that Plaintiff and Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been on December 21, 2024, following the airing of the expose by YouTuber MegaLag.

## CLASS ACTION ALLEGATIONS

56.    Plaintiff, on behalf of herself and all others similarly situated, seek relief under Federal Rules of Civil Procedure, Rule 23 on behalf of the following classes:

**Nationwide Class**

All individuals who generated income through affiliate marketing programs, had their affiliate tracking codes or cookies modified, replaced, or otherwise manipulated by Rakuten's Browser Extension and as a result, had their affiliate marketing commissions diverted to Rakuten (the "Class" or the "Nationwide Class").

**California Sub-Class**

All individuals who, while living in California, generated income through affiliate marketing programs, had their affiliate tracking codes or cookies modified, replaced, or otherwise manipulated by Rakuten's Browser Extension and as a result, had their affiliate marketing commissions diverted to Rakuten (the "California Sub-Class").

57.    The following people are excluded from the classes: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and their current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

58.    Plaintiff reserves the right to revise or amend the Nationwide Class or California Sub-Class (together, the "Classes") definition based on the discovery of new information.

59.    Numerosity: The exact number of members of the Classes is unknown but, upon information and belief, it is estimated to number in the thousands, and individual joinder in this case is impracticable. Members of the Classes can be easily identified through Defendant's records and objective criteria permitting self-identification in response to notice and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

60.    Typicality: Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff, and the members of the Classes, sustained damages arising out of Defendant's wrongful conduct, misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

61.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with, or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

62.    Commonality and Predominance: There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

a.  Whether Defendant violated the Electronic Communications Privacy Act, California's Unfair Competition Law, California Comprehensive Computer Data Access and Fraud Act, and Violation of the Cal. Invasion of Privacy Act;

b.  Whether Defendant's Browser Extension unlawfully intercepted and manipulated affiliate marketing tracking codes;

c.  Whether Defendant knowingly diverted commissions from content creators through its Browser Extension;

d.  Whether Defendant intentionally interfered with Plaintiff's and Class Members' prospective economic advantage;

e.  Whether Defendant engaged in unfair competition by misappropriating commissions rightfully earned by content creators;

f.  Whether Defendant's representations about its Browser Extension being merely a coupon-finding tool were deceptive;

g.  Whether Defendant's code injection practices violated computer access laws;

h.  Whether Defendant engaged in conversion by taking commissions that belonged to Plaintiff and Class Members;

i.  Whether Defendant was unjustly enriched by its commission-diversion scheme;

j.  Whether Defendant's conduct caused monetary damages to Plaintiff and Class Members; and

k.  Whether Plaintiff and Class Members are entitled to damages, restitution, and injunctive relief

63.  Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

64.  Such particular issues include, but are not limited to:

a.  Whether Defendant failed to timely and adequately disclose its practice of diverting affiliate marketing commissions;

b.  Whether Defendant owed a legal duty to Plaintiff and the Classes to respect

their affiliate marketing tracking codes and earned commissions;

   c.   Whether Defendant's practices violated standard affiliate marketing industry practices and attribution protocols;

   d.   Whether Defendant's failure to respect established affiliate marketing attribution standards amounted to negligence;

   e.   Whether Defendant failed to take commercially reasonable steps to honor content creators' affiliate marketing relationships; and

   f.   Whether adherence to standard affiliate marketing attribution practices and last-click protocols would have prevented the diversion of commissions from content creators.

65.   Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by Defendant's scheme.

**CAUSES OF ACTION**

**COUNT I**

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. §§ 2510, *et seq.***
**(*By Plaintiff on behalf of herself & the Nationwide Class*)**

66.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

67.   The Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*, makes it unlawful for a "person" to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communications." 18 U.S.C. § 2511(1).

68.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

69.   The transmission of Creators' unique affiliate source data (*i.e.*, unique ID and coupon code) to the vendor (via the cookie generated by consumer action) qualifies as Plaintiff's and Class Members' "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

70.     By allowing the Rakuten Shopping Browser Extension to intercept and surreptitiously manipulate creators' unique ID and coupon code contained in a cookie on consumers' web browsers, Defendant intentionally intercepted and/or endeavored to intercept the contents of "electronic communications" in violation of 18 U.S.C. § 2511(1)(a).

71.     No party to the electronic communication alleged herein consented to Defendant's interception and manipulation of the electronic communication. Nor could they, because Defendant's actions were surreptitious.

72.     18 U.S.C. § 2511(2)(d) provides an exception to 18 U.S.C. § 2511(1), under which: "It shall not be unlawful under this chapter [18 USC §§ 2510 et seq.] for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." (emphasis added).

73.     Defendant does not meet the requirements of the "party exception" to the ECPA because, as detailed herein, the electronic communications intercepted by Defendant were intercepted as part of Defendant's tortious practice of converting commissions and interfering with Plaintiff's and Class Members' economic advantage, that is also in violation of federal and state laws, including 18 U.S.C. § 1030, California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, California Invasion of Privacy Act, Cal. Penal Code §§ 630 et seq., and Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, as alleged herein.

74.     Accordingly, Defendant violated the ECPA each time it intercepted Plaintiff's and Class Members' electronic communications via the Browser Extension.

75.     Pursuant to 18 U.S.C. § 2520, Plaintiff and Class Members, have been damaged by the interception of their electronic communications in violation of the ECPA and are entitled to: (i) appropriate equitable or declaratory relief; (ii) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and the Class and any profits made by Defendant as a result of its violations, or (b) statutory damages of whichever is

the greater of $100 per day per violation or $10,000; and (iii) reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT II

### UNJUST ENRICHMENT
### *(By Plaintiff on behalf of herself & the Nationwide Class or, in the alternative, the California Sub-Class)*

76. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

77. Through its commission diversion scheme, as described above, Defendant receives a benefit in the form of commissions for sales that were not generated by its own affiliate links but by the affiliate links of Class Members.

78. In light of its conduct, it would be unjust for Defendant to retain the benefits it obtained from vendors and affiliate marketers like Plaintiff in the form of commissions it diverted from influencers, bloggers, and other content creators, *i.e.*, Plaintiff and Class Members.

79. Defendant has been unjustly enriched by the payment of diverted commissions and should be required in equity to make restitution of these payments to the Class Members from whom they were diverted.

## COUNT III

### INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### *(By Plaintiff on behalf of herself & the Nationwide Class or, in the alternative the, California Sub-Class)*

80. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

81. Plaintiff and Class Members were and continue to enjoy economic relationships with online vendor and/or the platforms that connect advertisers with affiliate marketers whereby Plaintiff and Class Members refer their followers to the vendors' websites by advertising vendors' products to the audiences on their social media accounts. In return, the vendors, directly or through affiliate marketing platforms, pay Plaintiff and Class Members commissions on sales they generate.

82. Defendant knew and continues to know that there is an economic relationship that exists between Plaintiff and Class Members, on the one hand, and vendors and/or affiliate marketing platforms, on the other hand.

83.     Defendant intentionally and unlawfully interferes with and disrupts that economic relationship via the Browser Extension, which intercepts and manipulates affiliate source codes that Plaintiff and Class Members provide to vendors and/or affiliate marketing platforms for the purpose of sale and commission attribution.

84.     As alleged above, the Rakuten Browser Extension offers the potential to customers to save money on their purchases by applying coupons, and, at the same time works in the background to remove the Plaintiff's and Class Members' affiliate source information from the tracking cookie and replaces it with its own information.

85.     This removal and replacement of Plaintiff's and Class Members' data in the tracking cookie results in commissions that were generated by Plaintiff's and Class Members' efforts being diverted to Defendant.

86.     Plaintiff and Class Members were harmed by Defendant's actions in that they were deprived of their earned commissions.

### COUNT IV

#### CONVERSION
#### *(By Plaintiff on behalf of herself & the Nationwide Class or in the alternative the California Sub-Class)*

87.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

88.     Plaintiff and other Class Members had the right to commissions that they earned from online vendors by referring customers to vendors' websites.

89.     Defendant intentionally and substantially interfered with Plaintiff's and Class Members' personal property by diverting commissions to themselves via the Rakuten Browser Extension that should rightfully go to Plaintiff and Class Members.

90.     Defendant's diversion and taking of Plaintiff's and Class Members' rightfully earned commissions was done without authorization.

91.     Plaintiff's and Class Members' rightful commissions diverted by Defendant to itself are specific sums capable of identification.

92.     Defendant's actions have deprived Plaintiff and Class Members of their rightful

commissions, causing them significant economic harm.  Plaintiff and Class Members lost income which they would have otherwise received, but for Defendant's wrongful conduct.

### COUNT V

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
***(By Plaintiff on behalf of herself and the California Sub-Class)***

93.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

94.    California Business & Professions Code § 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.

95.    Defendant's conduct as alleged herein was unfair within the meaning of the UCL. The unfair prong of the UCL prohibits unfair business practices that either offend an established public policy or that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to content creators.

96.    Defendant's conduct was fraudulent within the meaning of the UCL. Defendant made deceptive misrepresentations and omitted known material facts in connection with the operation of its Browser Extension. Defendant actively concealed and continued to assert misleading statements regarding the true nature of its Browser Extension as a simple coupon-finding tool, while secretly operating a scheme to divert affiliate marketing commissions.

97.    Defendant's conduct was unlawful within the meaning of the UCL because they violated regulations and laws as discussed herein, including but not limited to the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*, California Invasion of Privacy Act, Cal. Penal Code §§ 630 *et seq*., and Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502.

98.    Had Plaintiff and California Sub-Class Members known Defendant would intercept and manipulate their affiliate tracking data in contravention of Defendant's representations, she would have taken steps to protect her commissions and affiliate marketing relationships.

99.    Defendant's unlawful actions in violation of the UCL have caused and are likely to cause substantial injury to content creators that it cannot reasonably avoid themselves and that is

not outweighed by countervailing benefits to consumers or competition.

100. As a direct and proximate result of Defendant's misconduct, Plaintiff and California Sub-Class Members had their affiliate tracking information intercepted, manipulated, and used by Defendant to divert rightfully earned commissions.

101. As a result of Defendant's unlawful conduct, Plaintiff and California Sub-Class Members suffered injuries through loss of commission revenue, interference with their economic relationships with vendors and Affiliate Networks, loss of control over their affiliate tracking data, and damage to their affiliate marketing businesses.

102. Defendant engaged in unfair business practices by intercepting and manipulating Plaintiff's and California Sub-Class Members' affiliate tracking information without authorization or disclosure despite marketing its Browser Extension as merely a coupon-finding tool.

103. Plaintiff and the California Sub-Class Members reasonably relied upon the representations Defendant made about its Browser Extension being a tool to help consumers save money through coupons.

104. Defendant was in sole possession of and had a duty to disclose the material information that it was intercepting and manipulating affiliate tracking data to divert commissions.

105. Had Defendant disclosed that it diverted affiliate marketing commissions through manipulation of tracking data, Plaintiff and the California Sub-Class would have taken steps to protect their affiliate marketing relationships and commissions.

106. The harm caused by the Defendant's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described herein.

107. Defendant's acts, omissions and conduct violate the unfair prong of the UCL because those acts, omissions and conduct offend public policy, and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff and California Sub-Class Members.

108. As a direct result of Plaintiff's and California Sub-Class Members' reliance on Defendant's representations that its Browser Extension was merely a coupon-finding tool, and

Defendant's concealment of its true nature and operation, Plaintiff and the California Sub-Class have been damaged.

109.  Plaintiff, on behalf of herself and the California Sub-Class, seek restitution, injunctive relief, and all other relief available under the UCL.

110.  Plaintiff has suffered injury in fact and have lost money or property because of Defendant's acts and practices because she lost commissions that rightfully belonged to them as the parties whose marketing drove consumers to vendors' websites to purchase products.

111.  To protect Plaintiff and Class Members from Defendant's unfair and/or unlawful practices, Plaintiff seeks an order from this Court enjoining Defendant from unlawfully intercepting and manipulating Plaintiff's and Class Members' affiliate source data.

112.  Plaintiff lacks an adequate remedy at law because the ongoing harms from Defendant's actions and practices must be addressed by public injunctive relief and, due to the ongoing nature of the harm, the harm cannot be adequately addressed by monetary damages alone.

113.  This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Cal. Code of Civil Procedure § 1021.5 and other applicable law.

## COUNT VI

**VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT**
**Cal. Penal Code § 502**
***(By Plaintiff on behalf of herself & the California Sub-Class)***

114.  Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

115.  Penal Code § 502(c)(1) makes it an offense when a person: "[k]nowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer,

computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data."

116.   Defendant violated § 502(c)(1) when it accessed the Plaintiff Davis's and California Sub-Class Members' affiliate source information from the tracking cookie to replace it with Defendant's own information and thereby defraud and deceive or wrongfully obtain money or property belonging to Plaintiff and California Sub-Class Members.

117.   Cal. Penal Code § 502(c)(4) makes it an offense when a person: "Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network."

118.   Defendant violated § 502(c)(4) when it accessed the Plaintiff Davis's and California Sub-Class Members' affiliate source information from the tracking cookie and without permission deleted Plaintiff Davis's and California Sub-Class Members' affiliate source information from the tracking cookie, added Rakuten Shopping information to the tracking cookie, and thereby altered and destroyed data belonging to Plaintiff Davis and California Sub-Class Members.

119.   In so doing, Defendant injected source code to overcome technical barriers to such deletion and alteration of affiliate source information.

120.   Penal Code § 502(e)(1) provides a private right of action for "the owner or lessee of the…data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c)[.]"

121.   Plaintiff Davis and California Sub-Class Members were the owners of the data who suffered damage or loss because of Defendant's conduct. Defendant's acts and practices have deprived Plaintiff Davis and California Sub-Class Members of their ability to receive their commissions.

122.   Plaintiff Davis, on behalf of herself and California Sub-Class, seeks compensatory damages in accordance with Cal. Penal Code § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief.

123.   Plaintiff Davis and California Sub-Class Members have also suffered irreparable and

incalculable harm and injuries from Defendant's violations. The harm will continue unless Defendant is enjoined from further violations of this section. Plaintiff and Class Members have no adequate remedy at law.

124.   Plaintiff Davis and California Sub-Class Members are also entitled to punitive or exemplary damages pursuant to Penal Code § 502(e)(4) because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiff Davis and California Sub-Class Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

## COUNT VII

### VIOLATION OF THE CAL. INVASION OF PRIVACY ACT
### Cal. Penal Code §§ 630, *et seq*.
### *(By Plaintiff on behalf of herself & the California Sub-Class)*

125.   Plaintiff Davis re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

126.   Cal. Penal Code § 631(a) provides, in pertinent part: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500) . . ."

127.   Cal. Penal Code § 637.2(a) provides a private right of action to "[a]ny person who has been injured by a violation of this chapter [who] may bring an action against the person who

committed the violation for the greater of [$5,000 per violation or three times the actual damages]."

128. Defendant is each a "person" within the meaning of Cal. Penal Code § 631.

129. Plaintiff Davis's and California Sub-Class Members' communications with online vendors (via a cookie generated by consumer action) were intended to be confined to these parties, and Defendant was neither an intended party to nor authorized to intercept these communications.

130. Despite not having any authorization from Plaintiff Davis and California Sub-Class Members, Defendant intercepted these communications to learn the content of and manipulate those communications while in transit or in the process of being sent or received.

131. Defendant's conduct, as described above, violated Cal. Penal Code § 631.

132. Under Cal. Penal Code § 637.2, Plaintiff Davis and California Sub-Class Members are entitled to recover the greater of: (1) five thousand dollars ($5,000) per violation; or (2) three times the amount of actual damages according to proof at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Ashley Davis, on behalf of herself and all others similarly situated, prays for relief and judgement in her favor and against Defendant Rakuten and requests the following relief:

A.    An order appointing Plaintiff as the Class Representatives

B.    An order certifying the Class and California Sub-Class as requested and appointing the undersigned attorneys as Class Counsel;

C.    An order declaring that Defendant's conduct violates the laws referenced herein;

D.    An order awarding actual, statutory, punitive, consequential damages in an amount to be determined at trial;

E.    An injunction forbidding Defendant from intercepting and manipulating affiliate links in a manner that diverts commissions to Defendant for sales it did not generate;

F.    Disgorgement of all ill-gotten profits and restitution of all revenues obtained from Plaintiff and Class Members as a result of Defendant's unfair and unlawful conduct;

G.    An award of reasonable attorneys' fees and costs of suit, as provided by law;

H.    An award of reasonable attorneys' fees, as provided by Cal. Code Civ. Proc. §1021.5

I.   An award of pre- and post-judgment interest as provided by law; and

J.   An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a jury trial on all triable issues.

**DATED**: February 28, 2025          **ALMEIDA LAW GROUP LLC**


*/s/ John R. Parker, Jr.*
John R. Parker, Jr. (SBN 257761)
**ALMEIDA LAW GROUP LLC**
3550 Watt Avenue, Suite 140
Sacramento, California 95821
Tel: (916) 616-2936
jrparker@almeidalawgroup.com

David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Ave.
Chicago, Illinois 60614
Tel.: (708) 529-5418
david@almeidalawgroup.com

*Pro hac vice* forthcoming

*Attorneys for Plaintiff & the Putative Classes*

CLASS ACTION COMPLAINT